Filed 4/28/22  P. v. Monroy CA3
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086798 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F07390) |
| v. | OPINION ON TRANSFER |
| JANELLE MARQUEZ MONROY, | |
| Defendant and Appellant. | |

In October 2014, Luis Enriquez Monroy Bracamontes and Janelle Marquez Monroy traveled from Utah to California with an assortment of firearms, including an AR-15 tactical rifle.  Over the span of about two hours, they carved a path of destruction between Sacramento and Auburn.  During two separate shootouts, Bracamontes shot and killed two peace officers, Sacramento County Sheriff's Deputy Daniel Oliver and Placer County Sheriff's Detective Michael Davis, and attempted to kill at least four more.  After the first shootout and murder, Bracamontes shot and attempted to kill another man during

an attempted carjacking. Two successful carjackings brought Bracamontes and Monroy to Auburn, where the second shootout and murder occurred.

Bracamontes and Monroy were tried together before separate juries. This appeal involves only Monroy. She was convicted as an aider and abettor of one count of first degree murder (count two), four counts of attempted murder (counts four, nine, ten, & thirteen), two counts of carjacking (counts six & seven), two counts of attempted carjacking (counts five & eight), and one count of unlawful possession of an assault weapon (count fifteen).[1] With respect to all counts except the latter, Monroy was also found to have been armed with a firearm during the commission of the offense. She was sentenced to serve an aggregate determinate term of 23 years 10 months plus a consecutive indeterminate term of 25 years to life.

On appeal, Monroy contends: (1) the evidence is insufficient to support her convictions for first degree murder, attempted murder, and attempted carjacking; (2) we must remand the matter to the trial court for a determination regarding whether or not Monroy qualifies for mental health diversion under newly-enacted Penal Code[2] sections 1001.35 and 1001.36; (3) the trial court prejudicially erred and violated her federal constitutional rights by instructing the jury to disregard several of Bracamontes's outbursts during the trial; (4) the trial court also prejudicially erred and further violated her constitutional rights by providing the jury with an unmodified version of the standard

---

[1] Monroy was not charged with the murder and attempted murder of Sacramento County Sheriff's Deputies Oliver and Brown (counts one & three), but was charged as an aider and abettor with all crimes following the first shootout in Sacramento, except for the following: Bracamontes was charged individually with taking a patrol car (count eleven) and firearm (count twelve) belonging to the Placer County Sheriff's Department during the second shootout in Auburn and was also charged individually with possession of a firearm by a convicted felon (count fourteen).

[2] Undesignated statutory references are to the Penal Code.

duress instruction (CALCRIM No. 3402); (5) the cumulative prejudicial impact of the foregoing claims of instructional error requires reversal; and (6) we must order correction of the sentencing minutes and abstract of judgment.

We filed our initial opinion in this matter on June 1, 2021. In that opinion, we concluded, among other things, that Monroy's murder and attempted murder convictions were supported by substantial evidence. In so concluding, we rejected her argument that Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015, § 2), effective January 1, 2019, applied retroactively to her case in this direct appeal. In line with our Supreme Court's decision in *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*), we explained that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective." (*Id.* at pp. 851-852.) We further concluded, in line with *People v. Alaybue* (2020) 51 Cal.App.5th 207 (*Alaybue*), that Senate Bill 1437 does not apply to the crime of attempted murder.

Our Supreme Court granted review on August 25, 2021, and transferred the matter back to this court on December 29, 2021, with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775) (Stats. 2021, ch. 551, § 2), effective January 1, 2022. As we explain more fully in the discussion portion of this opinion, Senate Bill 775 amended the law to allow "[a] person convicted of murder, *attempted murder*, or manslaughter whose conviction is not final [to] challenge *on direct appeal* the validity of that conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437." (§ 1170.95, subd. (g), italics added; Stats. 2021, ch. 551, § 2.) In light of this new enactment, we shall address Monroy's challenge to the validity of her murder and attempted murder convictions based on Senate Bill 1437 and conclude they must be reversed. However, neither must be reversed for insufficient evidence. Instead, they must be reversed for instructional error. With respect to Monroy's attempted murder convictions, the jury was instructed with a

theory that is no longer legally tenable. With respect to her murder conviction, the jury was not instructed on the newly enacted requirements for conviction of felony murder. However, because these convictions were supported by substantial evidence at the time of trial, retrial is not barred by principles of double jeopardy.

With respect to Monroy's remaining contentions, her challenge to the sufficiency of the evidence supporting her attempted carjacking convictions also fails. We further conclude Monroy is not entitled to mental health diversion. Although the new law applies retroactively to her case, so too does an exclusion to placement in a diversion program for defendants charged with murder. (§ 1001.36, subd. (b)(2)(A).) Monroy's claims of instructional error also fail. The first such claim is in reality an assertion of evidentiary error and is forfeited. Even viewed under the rubric of instructional error, the claim is not saved from forfeiture by section 1259 because her substantial rights were not violated by any assumed instructional error. Also forfeited is Monroy's assertion that the trial court prejudicially erred and violated her constitutional rights by instructing the jury with an unmodified version of CALCRIM No. 3402. Nor did her trial counsel provide constitutionally deficient assistance by failing to object to, or ask the trial court to modify, the instruction. We also reject Monroy's assertion of cumulative prejudice. Finally, our resolution of the foregoing assertions of error makes it unnecessary to order the requested correction of the sentencing minutes and abstract of judgment.[3]

In sum, we shall reverse Monroy's murder and attempted murder convictions (counts two, four, nine, ten, & thirteen) and affirm the judgment in all other respects. The People shall have 60 days after the remittitur issues to inform the trial court whether or not they will retry Monroy for murder and/or attempted murder. In the event the

---

[3] We mention this issue no further.

4

People do not elect to retry her, the trial court shall confirm Monroy's remaining convictions (counts five, six, seven, eight, & fifteen) and resentence her accordingly.

FACTS

Monroy and Bracamontes were married in 2002. They lived in Utah with Bracamontes's brother, H., prior to the events giving rise to this appeal. We begin our recitation of those events in Utah on Monday, October 20, 2014.

That morning, H. was at work when he received a phone call from his brother. Bracamontes told H. to come back to the house and not to ask him any questions. Although he seemed "pretty normal" on the phone, this was not the sort of call Bracamontes typically made to his brother. H. drove home and found his brother in the hallway outside the room he shared with Monroy. His gaze was "very fixed, like he didn't blink," causing H. to believe he was on drugs. Bracamontes made a gesture running his finger across his neck. H. interpreted this to mean his brother had killed Monroy. As H. opened the door to the bedroom, Bracamontes pulled a handgun out of his pants pocket and pointed it at his brother's head.

Inside the bedroom, H. found Monroy sitting on the bed, physically fine, but hunched over with her head down. Bracamontes asked Monroy whether she and H. were having an affair. Monroy remained silent, but shook her head to indicate the answer was no. Not satisfied with that answer, Bracamontes directly accused H., who also denied having an affair with Monroy. Bracamontes continued accusing his brother and Monroy of having an affair. Throughout the course of their interaction in the bedroom, Bracamontes went from being very angry to being calm, alternating between these emotional states several times. H. had never seen his brother like this before.

The stress of these events caused Monroy to have an anxiety attack; she became short of breath and passed out. Bracamontes and H. came to her aid, but Bracamontes told H. he did not want his help. Bracamontes then helped Monroy to their car, a light-blue Mercury Grand Marquis, and said he was taking her to the hospital.

Later in the afternoon, H. also left the house. Before he left, H. took a bag from Bracamontes's room that contained various firearms, including an AR-15 tactical rifle. When Bracamontes discovered the bag was gone, he called H. and told him to return the firearms or he "would hit [him] where it hurt the worst." H. believed this to be a threat to harm his daughter. Bracamontes also threatened to kill H. Eventually, H. returned to the house with the bag of firearms. When he arrived, Bracamontes opened the trunk of the Mercury and H. put the bag inside. Bracamontes also told H. that he needed money. H. had just been paid and gave him $400. H. left the house and did not intend to return, except to pick up his belongings at a later date. He stayed at a friend's house that night.

The next day, H. returned to the house briefly to pick up a few items while his brother and Monroy were gone. He also drove past the house later that afternoon, apparently at the request of Monroy's father, and saw the Mercury was there.

On Wednesday, H. received a call from his brother, during which Bracamontes and Monroy accused H. of calling the police. H. had not done so and denied the accusation. Bracamontes then asked H. to drive past the house to see if the police were there. H. did so and called his brother back to let him know there were no police at the house. At some point during one of these conversations, Bracamontes said they were in California.

By Wednesday afternoon, Bracamontes and Monroy had indeed driven the Mercury from Utah to California. That afternoon in Vacaville, Monroy had another anxiety attack in a gas station parking lot. Bracamontes told a gas station attendant that his wife was ill. The attendant could see she was having difficulty breathing and told the manager to call 911. Paramedics arrived a short time later and were able to slow Monroy's breathing down. While she was being assisted, Bracamontes asked a firefighter for directions to Oregon several times. After Monroy's breathing had slowed, paramedics tried to transport her to the hospital for further medical care. She declined transport after looking to Bracamontes, apparently for his approval. While Bracamontes

6

did not say anything, one of the paramedics noted his demeanor indicated "[h]e did not want her to go to the hospital." After the emergency responders left the gas station, Bracamontes and Monroy entered the attached convenience store arm-in-arm and purchased some items. When Bracamontes used the restroom, Monroy was alone in the store near the cashier and did not indicate she needed help or was with her companion against her will.

Later in the afternoon, Bracamontes and Monroy bought a prepaid cell phone from another convenience store in Vacaville. They stayed at a motel in Vacaville that night. Monroy was the one who went inside the lobby to secure the room while Bracamontes remained in the parking lot. Monroy again did not indicate to anyone inside the lobby that she needed help or was renting the room against her will.

On Thursday, Bracamontes again called his brother, told him the Mercury had been in an accident, and said he needed around $1,500 to get the car fixed. He asked H. to wire the money to a location in Sacramento. H. was unable to give his brother the full amount, but did wire him around $300. Bracamontes and Monroy spent that night at a Motel 6 located on Arden Way in the North Sacramento area. Bracamontes smoked methamphetamine and marijuana that night. As Monroy described her husband's behavior that night: "He got paranoid, and he wouldn't go to sleep. [¶] . . . [¶] . . . He was always thinking that somebody was gonna get him."

### Shootout at the Motel 6

On Friday, October 24, at around 10:30 a.m., Sacramento County Sheriff's Deputies Daniel Oliver and Scott Brown decided to drive through the parking lot of the Motel 6 where Bracamontes and Monroy stayed the night before. The deputies were members of a problem-oriented policing unit, with responsibilities ranging from community outreach to high-impact sweeps of areas known to be high in crime. The Motel 6 was one of those problem areas.

7

Deputies Oliver and Brown entered the motel parking lot looking for any suspicious vehicles or activity. Oliver drove and Brown was seated in the patrol car's passenger seat. After checking out two vehicles in the motel's front parking lot, the deputies drove through the back parking lot and found two people, Bracamontes and Monroy, in a light-blue Mercury. The car was parked in a stall facing the motel and the trunk was open. It appeared to Brown as though the occupants were loading the car and preparing to leave the motel.

Deputy Oliver parked behind the Mercury, but off-center so as not to prevent it from backing out of the stall, and both deputies got out of their vehicle to engage the Mercury's occupants in conversation. As Oliver approached the driver's side, Brown walked around the open trunk to get a clear view of the passenger side of the vehicle and found Monroy getting out of the backseat. Apparently noticing Oliver's presence first, Monroy immediately reached back towards the trunk and shut it. As Brown directed a "ma'am" towards Monroy to get her attention, she turned around "with a startled look." Brown directed her to sit down in the backseat.

As Monroy complied with Deputy Brown's directive, Bracamontes opened fire on Deputy Oliver from the driver's side of the car. Brown backpedaled from the Mercury at a 45-degree angle as he drew his service pistol. Not seeing his partner behind the car, Brown correctly assumed he had been shot and was on the ground. As Brown retreated backwards, Bracamontes "came up from the driver's side door area, leveled a gun at [him,] and started shooting." Brown returned fire, "feed[ing] rounds through the back window" towards the driver's side, where Bracamontes had ducked down to avoid being hit. A brief pause in the gunfire allowed Brown to maneuver around the back of the Mercury in an attempt to see where his partner was and also get to a better firing position. As he did so, Bracamontes raised an AR-15 tactical rifle above the roof of the car and again opened fire. Realizing he was outgunned and out in the open, Brown ran to find cover while radioing: "Shots fired, shots fired . . . Officer down." Brown heard a final

8

single gunshot as he crouched behind the wheel well of a parked car and thought Bracamontes had "executed" his partner. Moving to a different location with a better line of sight, Brown saw the Mercury back out of the parking stall and then drive over Oliver's body on its way out of the parking lot.

The entire shootout between Bracamontes and the deputies lasted about a minute. Deputy Oliver died from a single gunshot wound to the head and also sustained blunt force injuries from being run over.

Based on these events, Bracamontes was convicted of one count of first degree murder (count one) and one count of attempted murder (count three). As mentioned, Monroy was not charged with these offenses.

### *Events on Spanos Court*

Leaving the Motel 6 parking lot, Bracamontes drove the Mercury onto Ethan Way and made an immediate right turn onto Arden Way. As he did so, another motorist noticed movement in the backseat, drawing her attention to the car. She then noticed bullet holes in some of the Mercury's windows and also saw the driver was holding a "black assault rifle." He covered the rifle with a towel before turning onto Arden Way. From there, the Mercury made its way down Howe Avenue to Spanos Court a short distance away and pulled into a parking lot. During that brief drive, Bracamontes told Monroy that they needed another car.

A. was seated in a burgundy Oldsmobile in the parking lot when the bullet-riddled Mercury arrived. Bracamontes got out of the Mercury and approached A.'s car with a handgun. As he did so, Monroy also got out of the Mercury. According to a witness watching from the window of an adjacent doctor's office, she "kind of stood there for a few seconds, then went to the rear door on that passenger side, opened the rear door, kind of bent over, and was . . . rummaging through something." When Bracamontes got to A.'s car, he opened the driver's side door and said: "Give me your car." A. responded: "Man, I don't know you." A short angry argument ensued, at the end of which

9

Bracamontes gave A. a smirk, pointed the handgun at him, and fired five rounds as A. fought back.

Another witness in the parking lot described Bracamontes running towards the Oldsmobile, shortly after which Monroy got out of the Mercury, took off a shawl or blanket, and put it inside the car. According to this witness, during the argument between Bracamontes and A., before Bracamontes pulled the trigger, Monroy looked over in their direction and said "stop it" in a calm voice that did not match the chaotic nature of these events.

One bullet struck A. in the head, entering his ear and exiting his mouth. Two bullets hit him in the left hand and another bullet hit him in the right hand, fracturing various bones in the process. Bracamontes left A. bleeding in his car and returned to the Mercury. A. survived his injuries.

Having failed to take A.'s car, Bracamontes and Monroy drove out of the parking lot and turned onto Spanos Court. At the end of the court, they made a U-turn and pulled up next to a white Ford Mustang being driven by C. She was returning home from the gym and about to pull into her apartment complex when Bracamontes pulled up beside her with the window down and said, "excuse me." C. thought he was seeking directions, so when he got out of the Mercury, she also started to get out of her car to see if she could help. Bracamontes was holding a handgun and had blood dripping from his hand. He told C.: "You need to get out of the car." C. complied and started walking quickly towards her apartment complex.

Briefly looking back to make sure he was not following, C. saw Bracamontes getting into the Mustang and Monroy standing behind the Mercury. Bracamontes yelled to Monroy: "Grab the stuff, grab the stuff." Monroy did so, transporting their belongings, including the AR-15 wrapped in a jean jacket, from the Mercury to the Mustang. Another motorist who was driving down Spanos Court noticed the Mercury with bullet holes in the back window and saw Monroy holding a "huge gun in her hands."

10

Bracamontes was in the driver's seat of the Mustang looking back towards Monroy, who ran with the gun towards the Mustang. Meanwhile, C. continued walking to her apartment complex's office and told the manager to call 911. She informed the dispatcher about the carjacking and that her Mustang had driven away towards Howe Avenue.

Based on these events, Bracamontes and Monroy were convicted of one count of attempted murder (count four), one count of attempted carjacking (count five), and one count of carjacking (count six).

### *Flight from Sacramento to Auburn*

From Spanos Court, Bracamontes and Monroy drove a short distance to Casmalia Way in the Arden Park neighborhood, where Bracamontes got out of the Mustang, approached a landscaper on foot, and asked about taking a truck that was parked at the house where the landscaper was working. Bracamontes had an abrasion on his face and was bleeding from his forehead, "like he had been roughed up a little bit." He was not wearing a shirt, but had one wrapped around his hand, and was holding a handgun in his other hand. Bracamontes asked the landscaper for a "favor" and said he needed the keys to the truck. The landscaper said the truck did not belong to him. Gesturing to a contractor who was also working at the house, Bracamontes asked: "And him?" When the landscaper told the contractor that Bracamontes wanted the keys to the truck, the contractor put his hands up and responded: "It's not my truck." The landscaper then asked Bracamontes whether he needed any help. Bracamontes told the landscaper not to call the police and walked away. He got into the Mustang and drove off with Monroy.

Less than a mile away, in the same neighborhood, Bracamontes and Monroy pulled up to another landscaper, J., who was operating a leaf blower. After some initial pleasantries, Bracamontes asked J. whether a nearby truck belonged to him. J. said it did. Bracamontes then said he needed a "favor," pulled out a handgun, and said: "I need your truck." Bracamontes started to get out of the Mustang as Monroy implored: "Please help

11

us." Pointing the gun at J. and walking him over to the truck, a red Ford F-150 with a trailer attached, Bracamontes told Monroy to park the Mustang across the street. Monroy did so.

At the truck, J. asked whether he could remove the trailer containing his tools so he could continue working. Bracamontes responded: "Quickly, because they are following me." He then helped J. remove the trailer while Monroy made at least two trips between the Mustang and the truck, again transporting their belongings, including the AR-15, over to the new vehicle. While removing the trailer, Bracamontes's cell phone fell out of his pocket and J. kicked it into some grass so that he could use it to hopefully retrieve his truck. Monroy apparently saw, picked up the phone, and put it inside the truck with the rest of their belongings. J. then handed over the keys. Monroy got into the truck's extended cab, Bracamontes covered her with a jacket, and the two drove away. J. immediately called 911 and reported the carjacking.

From Arden Park, Bracamontes and Monroy made their way to Interstate 80 and continued on to Auburn. Local radio was covering the officer-involved shooting in Sacramento and providing information about the suspects and the red F-150 they were last known to be driving. During the drive, Monroy found a construction hat in the truck's extended cab and handed it to her husband to help prevent identification. As she explained during her testimony at trial, "everybody knows that he's, what, a bald, umm, Mexican-looking guy," so she gave him the hat to cover his head so that they could hopefully escape apprehension. On Mesa Vista Way in the South Auburn area, Bracamontes pulled over, took off the truck's license plate, and threw it in the truck bed. A resident on that street who had been listening to the radio broadcasts saw this and called 911.

Not far from where Bracamontes removed the license plate, the red F-150 pulled up to a house where a work crew was taking a lunch break after spending their morning doing roofing work. Bracamontes was driving the truck and engaged one of the roofers

12

in conversation.  After asking how work was going, Bracamontes told him:  "I need your truck."  The roofer explained that his boss had just taken the truck to go out to lunch.  Around this time, the roofer looked inside the F-150 and saw Monroy lying down in the extended cab.  Asked when his boss would return, the roofer said it would be about an hour.  Bracamontes drove away.  About 30 minutes later, he returned and asked a different member of the work crew whether his boss had returned.  The answer was no.  Bracamontes then asked whether someone could give him a car or drive him to Reno, offering money for the ride.  Again receiving no as the answer, Bracamontes again drove away.

Based on these events, Bracamontes and Monroy were convicted of one count of carjacking (count seven).

### Shootout on Riverview Drive (Part One)

Meanwhile, Placer County Sheriff's deputies were receiving updates over their radios about the murder of Deputy Oliver in Sacramento and possible sightings of the suspects in the red F-150.  As Deputy Charles Bardo explained, all units in the area were in "search mode."

Deputy Bardo and several other deputies, including Joseph Roseli, parked along Auburn Folsom Road to coordinate their search efforts.  Bardo and Roseli teamed up to search together and drove their separate patrol cars through a residential community on Maidu Drive.  When they got to that street's intersection with Riverview Drive, the deputies pulled over to listen to information being broadcast over their radios about a possible sighting of the F-150 on Riverview to their north.  As Bardo started to move his patrol car into a better position, he heard Roseli yell:  "Hold up, hold up."  The F-150 was traveling south on Riverview towards the deputies' position on Maidu.  It then stopped abruptly and started to back up.  Bardo turned onto Riverview to engage the vehicle.  Roseli followed.

13

As the deputies approached with their emergency lights activated, Bracamontes stopped reversing the F-150 just past a house on Riverview. Parked in front of that house was a BMW sedan owned by M., who was at the house visiting his mother. M. was standing next to his car having a conversation on his cell phone when the F-150 drove past the house and then backed up and again passed the house in reverse. When the truck stopped, Bracamontes got out holding a handgun and said to Monroy: "I'm gonna get that guy." He quickly approached M. with the gun, coming within about eight feet, before turning around and returning to the truck as Deputy Bardo pulled up and stopped his patrol car about 20 feet south of the BMW. Gunfire erupted as M. ran to a neighbor's driveway.

Bracamontes opened fire on Deputy Bardo from behind the F-150's driver's side door. The shooting started so quickly that Bardo did not put the car in park or remove the keys from the ignition before getting out to return fire. As Bardo returned fire from behind his patrol car's driver's side door, emptying his clip in a matter of seconds, the car started to roll forward towards the BMW. By this point, Deputy Roseli had pulled up behind Bardo's car and was yelling: "Chuck, get the fuck out of there, get the fuck out of there." Roseli joined in the gunfire, firing at Bracamontes with an AR-15 tactical rifle from behind his patrol car, as Bardo maneuvered backwards towards Roseli's position. Bardo tripped and fell before he made it the full distance. Roseli helped him up and pulled him behind the patrol car, yelling: "Are you hit?" Bardo answered: "I'm good, I'm good. Just keep your eyes on him."

Deputy Bardo's patrol car continued rolling forward during the firefight and eventually hit the BMW, at which point Bracamontes ran over and got in. Deputy Roseli yelled: "He's getting in your car." Bracamontes reversed a short distance to clear the BMW and then drove north on Riverview towards Skyridge Drive as Roseli fired at the vehicle and Bardo informed dispatch over the radio that shots had been fired near

14

Riverview and Maidu and that the suspect had taken his car and now had access to the shotgun and bandolier that were in the passenger compartment.

Based on these events, Bracamontes and Monroy were convicted of one count of attempted carjacking (count eight) and two counts of attempted murder (counts nine & ten). Bracamontes was additionally convicted of unlawfully taking or driving a law enforcement vehicle (count eleven).

### Shootout on Riverview Drive (Part Two)

Riverview ends a short distance past Skyridge with a large oak tree in the center of the cul-de-sac. Bracamontes drove Deputy Bardo's patrol car past Skyridge and stopped in front of a house to the left of that tree. He picked up several pursuers at Skyridge.

Placer County Sheriff's Detectives Michael Davis and Michael Simmons had been driving separate unmarked vehicles on Auburn Folsom Road in search of the F-150 when Deputy Bardo's dispatch came over the radio. Simmons had another deputy, Ryan Zender, in his passenger seat. Hearing "shots fired," the detectives activated their lights and sirens and quickly made their way to Riverview via Skyridge. Davis knew the area from a previous stint with the Auburn Police Department and took the lead. When they got to Skyridge and Riverview, Bracamontes drove through the intersection in Bardo's patrol car. The detectives turned onto Riverview following Bracamontes. However, Simmons believed they were following another deputy who was in pursuit of the suspect. Davis likely thought the same based on where he parked at the end of the cul-de-sac. As mentioned, Bracamontes parked in front of a house on the left side of the cul-de-sac. Davis parked behind Bardo's patrol car, to the left of the tree at the end of the street, while Simmons circled that tree and parked to the right of Bardo's patrol car. As Simmons explained at trial, had they known they were following the suspect rather than another deputy, they would have parked further up Riverview and not "so close to the vehicle" with "no cover at all."

15

Also responding to the "shots fired" dispatch, following behind Detectives Davis and Simmons, were Deputy Jeff Davis and Detectives Ken Addison and Richard Gray. As these vehicles pulled up, taking various positions behind Davis and Simmons, Bracamontes opened fire on his pursuers, firing a steady barrage of bullets with his AR-15. As Gray described the shooting, "it was constant paced, and it was just a bang, bang, bang, bang, bang, until it stopped."

Detective Gray immediately got out of his car, retrieved his AR-15 from the trunk, and headed towards the gunfire. During his approach, Gray saw Detective Davis moving from the passenger side of his car, around the back, and towards the driver's side when he fell to a push-up position and slowly lowered himself to the ground. Realizing Davis had been shot, Gray ran over and attempted communication. Davis was unresponsive.

Meanwhile, Detective Simmons and Deputy Zender both got out of Simmons's car through the passenger's side door when the shooting started. Looking over at Detective Davis's car, Simmons could not see his torso, but saw legs under the car "and it looked like he was kneeling at the left rear tire." Still unaware that the patrol car they followed into the cul-de-sac was driven by Bracamontes, Simmons believed the shots were being fired by another deputy at a suspect somewhere behind Davis's position. Based on this belief, when the shooting stopped, Simmons yelled: "Where is he?" At this point, a bystander who had taken cover in some nearby bushes yelled to Simmons: "He ran around the house." Rather than follow in pursuit, Simmons ran over to Davis, who was now lying face down and motionless on the roadway. Simmons yelled at him to get up and rolled him over. As Simmons described, "All I saw was blood coming out of his mouth and nose area, was just coming out." Simmons started yelling, "No, no, no, no, no, no, no," and grabbed him by the chest to try to get him up.

Detective Gray, who had taken up a protective position with his AR-15, told Detective Simmons to get Detective Davis out of the cul-de-sac. Simmons did so, picking Davis up with the assistance of Deputy Zender, putting him in the back of his car,

16

and driving him up Riverview towards Maidu Drive, where additional units were stationed, including Auburn Police Department Sergeant Dale Hutchins. Hutchins and Simmons performed cardio-pulmonary resuscitation (CPR) on Davis, keeping him alive until he was transported to Sutter Roseville Hospital, where he would later die of his injuries.

Detective Davis was not the only one who was hit by Bracamontes's gunfire. Deputy Davis was hit in the arm at some point during the shooting. He realized as much as he returned fire with his service pistol. After two successful trigger pulls, his hand was no longer cooperating with his efforts to fire the gun. He then noticed blood streaming down his arm and yelled: "I'm hit, I'm hit." Detective Addison, who had also exited his vehicle with his AR-15 and was heading towards the gunfire, heard the deputy yelling that he had been shot and ran over to him. After the shooting stopped, Addison drove him to a nearby fire station to receive medical attention. Deputy Davis was also transported to Sutter Roseville Hospital.

Based on these events, Bracamontes and Monroy were convicted of one count of first degree murder (count two) and one count of attempted murder (count thirteen).

### Apprehension of Monroy and Bracamontes

When Bracamontes fled in Deputy Bardo's patrol car after the first portion of the shootout on Riverview Drive, Monroy remained in the F-150's extended cab. At some point, she moved to the front passenger's seat. After Detective Davis was shot by Bracamontes during the second portion of the shootout and driven out of the cul-de-sac by Detective Simmons, Monroy called 911 from inside the truck and was taken into custody during that phone call.

Meanwhile, after the shootout described above, Bracamontes ran behind a house carrying a handgun, the AR-15, and the shotgun from Deputy Bardo's patrol car. He continued along some dirt trails adjacent to an irrigation canal and eventually entered a house on Belmont Drive. SWAT teams from multiple law enforcement agencies

17

responded to the house. After more than an hour of ordering Bracamontes to come out of the house failed, gas was deployed to force him out. About an hour later, Bracamontes crawled out of the house and was taken into custody.

In addition to the crimes already noted, Bracamontes and Monroy were also convicted of the unlawful possession of an assault weapon (count fifteen). Bracamontes was additionally convicted of possession of a firearm by a convicted felon (count fourteen).

We finally note Monroy testified in her own defense at trial. She acknowledged participating in most of the events recounted above, but claimed she did so under duress, afraid that Bracamontes would kill her if she tried to escape or refused to assist him by transporting the AR-15 from vehicle to vehicle during the carjackings. Additional evidence undermining her duress defense will be described in the discussion portion of the opinion, to which we now turn.

DISCUSSION

I

*Sufficiency of the Evidence*

Monroy contends the evidence is insufficient to support her convictions for the attempted murder and attempted carjacking of A. in the parking lot on Spanos Court in Sacramento, the attempted carjacking of M. on Riverview Drive in Auburn, the first degree murder of Detective Davis, and the attempted murders of Deputies Bardo, Roseli, and Davis.

We address the attempted carjacking convictions first and conclude they are supported by substantial evidence. We then turn to the murder and attempted murder convictions and conclude they must be reversed, but not for insufficient evidence. As we explained in our original opinion in this matter, each of these convictions was supported by substantial evidence at the time of trial.

18

However, because Monroy's jury was instructed with a theory of attempted murder that is no longer legally tenable, i.e., natural and probable consequences (§ 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime"]; Stats. 2018, ch. 1015, § 2), and there is no basis on which to conclude this "alternative-theory error" was harmless beyond a reasonable doubt (*People v. Aledamat* (2019) 8 Cal.5th 1, 13), we must reverse Monroy's attempted murder convictions. With respect to Monroy's murder conviction, we conclude it was based solely on the felony-murder rule, which now requires proof that the participant in the perpetration or attempted perpetration of the underlying felony was either "the actual killer," or possessed "the intent to kill" and "aided, abetted, counseled, [etc.] the actual killer in the commission of murder in the first degree," or "was a major participant in the underlying felony and acted with reckless indifference to human life," or "the victim was a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subds. (e), (f).) Monroy's jury was not instructed on these newly enacted requirements and therefore did not "decide every essential element of the crime." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71 (*Figueroa*).) As we explain, the People may elect to retry Monroy for these crimes.

## A.

### *Legal Principles*

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.] Reversal

19

on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)

As amended by Senate Bill 1437, section 188 provides in relevant part: "[M]alice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a).)

Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] carjacking." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice. Prior to Senate Bill 1437, " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.) Senate Bill 1437 amended the felony murder rule to provide: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless

20

indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).) Subdivision (f) then provides: "Subdivision (e) does not apply to a defendant when the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subd. (f).)

The crime of carjacking is "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).)

An attempt to commit a crime is itself a crime (§ 664), consisting of two elements: "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Thus, the crime of attempted carjacking requires the specific intent to commit a carjacking and a direct but ineffectual act done toward committing the intended carjacking. (See *People v. Medina* (2007) 41 Cal.4th 685, 701-702.) Similarly, the crime of attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act done toward committing the intended murder. (See *People v. Smith* (2005) 37 Cal.4th 733, 739.)

Finally, we note that "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea— knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and

21

abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) The latter aiding and abetting requirement is satisfied where the aider and abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

With these legal principles in mind, we now address the sufficiency of the evidence supporting Monroy's convictions for attempted carjacking, attempted murder, and first degree felony murder.

### B.

### *Attempted Carjacking Convictions*

Monroy asserts the evidence does not support a conclusion she aided and abetted the attempted carjacking of either A. on Spanos Court or M. on Riverview Drive.

With respect to A., she argues "[s]he was simply there in the parking lot while Bracamontes victimized him," and her mere presence and failure to prevent a crime is insufficient to establish aiding and abetting. We disagree.

" 'Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime. [Citation.]' [Citation.] Along with presence at the scene of the crime and failure to prevent it, 'companionship' and 'conduct before and after the offense,' including 'flight,' are relevant to the jury's determination as to whether a defendant aided and abetted in the commission of the crime. [Citation.]" (*People v. Lara* (2017) 9 Cal.App.5th 296, 322.)

Monroy does not dispute she was present in the parking lot when Bracamontes tried to take A.'s car at gunpoint. Nor can there be any doubt she was aware of Bracamontes's criminal purpose. He told her they needed another car during the drive

22

from the Motel 6 to Spanos Court, got out of the Mercury with a handgun, and walked towards A.'s Oldsmobile with the gun. This is more than enough for a jury to have reasonably concluded Monroy knew Bracamontes intended to commit a carjacking. But did she share in that purpose or intend to encourage or facilitate its commission? Monroy argues the answer is no because a witness in the parking lot testified that Monroy said "stop it" while Bracamontes and A. were arguing, and such a statement "can't be construed as an act of encouragement." While admittedly not an encouraging statement, nor was the jury required to conclude the statement was designed to discourage Bracamontes from committing the carjacking. It may well have been an expression of irritation over the loud argument that Bracamontes and A. were having in the parking lot, an argument that was drawing the attention of witnesses. Indeed, warning Bracamontes that the argument was drawing such attention is entirely consistent with the role of a lookout. Viewed in the light most favorable to the judgment, as we must, this statement does not support Monroy's assertion on appeal that she was expressing disapproval regarding Bracamontes's criminal conduct.

Other factors, however, support the jury's conclusion Monroy possessed the requisite intent to aid Bracamontes in the commission of the carjacking, specifically, companionship and conduct before and after the offense. In *In re Lynette G.* (1976) 54 Cal.App.3d 1087 (*Lynette G.*), the Court of Appeal affirmed a robbery conviction where the minor was with three friends when one of them hit the victim over the head and took her purse and a shopping bag. In addition to presence at the scene of the crime, the minor "fled with the perpetrator and two others after the crime had been committed and was still in their company shortly thereafter." (*Id*. at p. 1095.) The court explained: "Although flight, in and of itself, may be explained by a desire merely to disassociate oneself from an unexpected criminal activity, the trial court was not required to adopt that view; it could, reasonably, have concluded that had [the minor's] flight been from fear of an

23

unjustified charge of involvement, she also would have immediately disassociated herself from the other three girls." (*Ibid.*)

Here, Monroy not only fled with Bracamontes after the failed carjacking attempt, but she immediately helped him commit another carjacking on Spanos Court (C.'s Mustang), and shortly thereafter helped him commit another carjacking in the Arden Park neighborhood (J.'s F-150), transporting the AR-15 from vehicle to vehicle during these crimes. Monroy does not challenge the sufficiency of the evidence to support her convictions for having aided and abetted in those two completed carjackings. Based on this subsequent conduct, the jury could have reasonably concluded Monroy was outside the Mercury and rummaging around in the backseat of the car in order to similarly assist Bracamontes in transporting items from the Mercury to the Oldsmobile. In short, far from immediately disassociating herself from Bracamontes, Monroy actively assisted him in committing subsequent similar crimes and ensuring he remained armed with the assault rifle he had already used during the shootout at the Motel 6 and would again use during the shootout on Riverview Drive.

We also note Monroy's defense at trial was one of duress. According to her testimony, she was afraid Bracamontes would kill her or others if she did not assist him as directed. The jury, however, was free to disbelieve her testimony in this regard. Indeed, it is belied by her behavior following their arrests. In a separate interrogation room from Bracamontes, Monroy yelled to him: "I love you, Tiger." During her interrogation, the first question she asked detectives was whether she could see her husband. While housed at separate jails, Monroy and Bracamontes wrote to each other. We need not set forth the entirety of their correspondence here. One example will suffice. Referring to one of the shootouts between Bracamontes and law enforcement, Monroy wrote that a bullet grazed her left torso leaving a scar, adding: "It is my remembrance of the last time that we were together." Monroy also wrote: "I am not going to lie to you, I did get very scared, but not for myself. [¶] I was more scared that

24

something would happen to you. That was something that I would not have been able to bear."

We conclude the evidence in this case was more than sufficient to support a conclusion that Monroy aided and abetted Bracamontes in his attempt to carjack A. on Spanos Court.

Also unavailing is Monroy's argument that the evidence does not support a conclusion she aided and abetted the attempted carjacking of M. on Riverview Drive in Auburn.

Again, "aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez*, *supra*, 35 Cal.4th at p. 1225.)

Monroy's argument is limited to the third area listed above. For good reason. There is ample evidence Bracamontes got out of the F-150 near the BMW with a handgun in order to take that car from M. by means of force or fear. Thus, while intending to commit a carjacking, Bracamontes performed a direct but ineffectual act toward committing that crime. (§§ 21a, 215, subd. (a).) Nor can there be any doubt Monroy knew about Bracamontes's intent in this regard. She admitted during her testimony at trial that Bracamontes said, "I'm gonna get that guy," when he got out of the truck with the gun. Moreover, as with the attempted carjacking of A., a reasonable jury could have concluded Monroy intended to assist in the completion of the crime by moving items to the new vehicle like she did with the completed carjackings of C. and J. Again, she does not challenge the sufficiency of the evidence supporting her convictions for aiding and abetting in those completed carjackings.

25

With respect to Monroy's actus reus, she argues "none of the evidence pointed toward Monroy having done anything to help Bracamontes" in his attempt to take the BMW. The jury could have reasonably concluded Monroy did not have time to do anything physically to assist Bracamontes because Deputies Bardo and Roseli immediately pulled up, causing Bracamontes to retreat to the truck and open fire on the deputies. But physical assistance is not required. Returning to *Lynette G.*, *supra*, 54 Cal.App.3d 1087, there was no evidence the minor in that case physically assisted her companion in taking the purse and shopping bag. Her presence at the scene of the crime, along with her companionship with the direct perpetrator and their common flight afterwards, was sufficient to support a reasonable conclusion her presence was intended to assist or encourage the commission of the crime. (*Id*. at p. 1095.) As our Supreme Court has stated: " 'To be an abettor the accused must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission. . . .*' [Citations.]" (*People v. Durham* (1969) 70 Cal.2d 171, 181.)

Here, the evidence established that Monroy, after assisting Bracamontes in two successful carjackings, willingly accompanied him to Auburn in the stolen F-150, handed him a construction hat during the drive to help shield his identity, remained in the truck with Bracamontes while he sought out another vehicle, and was available to assist in transferring their belongings to the new vehicle were he to successfully take one. We conclude this evidence is more than sufficient to support a reasonable conclusion that Monroy's continued presence in the F-150 was for the purpose of assisting her husband in the commission of another carjacking to further their common goal of escaping apprehension.

Substantial evidence supports Monroy's conviction for the attempted carjacking of M. on Riverview Drive.

## C.

### *Attempted Murder Convictions*

Turning to Monroy's convictions for the attempted murders of A. on Spanos Court and Deputies Bardo, Roseli, and Davis in Auburn, Monroy notes her jury was instructed on two theories of attempted murder: (1) she directly aided and abetted Bracamontes in committing attempted murder, sharing his intent to kill; and (2) she aided and abetted Bracamontes in committing carjacking, attempted carjacking, or possession of an assault rifle, and the attempted murders were a natural and probable consequence of these crimes.

In our initial opinion in this matter, we agreed with Monroy's argument that there was no substantial evidence in the record supporting a conclusion that she directly aided and abetted the crime of attempted murder, but nevertheless affirmed her convictions because substantial evidence supported the natural and probable consequences theory.[4] In so concluding, as mentioned previously, we rejected Monroy's argument that Senate Bill 1437 applied retroactively to her case in this direct appeal, and further concluded that the new enactment does not apply to the crime of attempted murder. Neither conclusion survives Senate Bill 775. (§ 1170.95, subd. (g) ["A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437."]; Stats. 2021, ch. 551, § 2.)

---

[4] As both Monroy and the Attorney General point out, while our original opinion explicitly concluded substantial evidence did not support direct aiding and abetting as a theory of attempted murder in counts nine, ten, and thirteen, we did not explicitly state the same conclusion applied to count four. That conclusion was, however, implicit in our analysis of that conviction.

Senate Bill 1437 eliminates the natural and probable consequences doctrine as a valid theory of murder, and Senate Bill 775 makes clear this conclusion also applies to attempted murder.  Accordingly, one of the two theories of attempted murder pursued against Monroy in this case is no longer a valid theory of attempted murder.  (§ 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime."].)  In such a situation, a "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt."  (*People v. Aledamat*, *supra*, 8 Cal.5th at p. 13.)  Where the jury "might have based its verdict on the invalid theory," and there is no other basis upon which to find the error harmless beyond a reasonable doubt, reversal is required.  (*Ibid*.; see also *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), superseded by Senate Bill 1437 as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, at fn. 3.)  That is the case here, as the Attorney General properly concedes.  We must therefore reverse Monroy's attempted murder convictions.

Whether retrial should be permitted is another matter.  Monroy acknowledges that generally retrial is allowed "where reversal is based on instructional error," but she nevertheless argues retrial should be barred in these unique circumstances because the only remaining legal theory, direct aiding and abetting, is not supported by substantial evidence.  In making this argument, she relies on *People v. Glenos* (1992) 7 Cal.App.4th 1201 (*Glenos*), in which a conviction for making space available for the manufacture of methamphetamine was reversed based on instructional error and insufficient evidence.  There, the jury was not instructed on an element of the offense, specifically, "that the controlled substance must be manufactured for sale or distribution."  (*Id*. at p. 1211.)  The defendant argued the instructional error was prejudicial because "the prosecution presented no evidence" to prove this omitted element.  (*Ibid*.)  Our colleagues at the Fifth Appellate District agreed the error was prejudicial, but explained there was substantial

28

evidence that the manufacturers intended to sell or distribute the methamphetamine. The evidentiary shortcoming was a failure to prove the defendant knew about the manufacturers' intent to do so. (*Id*. at p. 1212.) The court concluded in these circumstances, the conviction had to be reversed "not only" for instructional error, but also for insufficient evidence, barring retrial. (*Ibid*.)

Monroy also acknowledges, citing *Figueroa*, *supra*, 20 Cal.App.4th 65 and *People v. Eagle* (2016) 246 Cal.App.4th 275, that "this exception has its own exceptions[,] . . . where, for example, the error involves omission of a new element retroactively added to the offense." Because, she argues, "no new element is involved," retrial should be barred for the attempted murders. We are not persuaded by Monroy's suggestion that retrial is only proper where the retroactive change in the law adds a new element to an offense. Instead, retrial is properly allowed in situations in which the change in the law invalidates a theory upon which the conviction was based; in such a case, where reversal is warranted, appellate courts routinely remand the matter to the trial court to allow the prosecution to retry the defendant on a legally valid theory without testing the sufficiency of the evidence supporting the other theory.

For example, in *Chiu*, *supra*, 59 Cal.4th 155, our Supreme Court "held that natural and probable consequences liability cannot extend to first degree premeditated murder." (*People v. Gentile*, *supra*, 10 Cal.5th at p. 838.) The *Chiu* court affirmed the Court of Appeal's judgment of "revers[ing] the first degree murder conviction, [and] allowing the People to accept a reduction of the conviction to second degree murder or to retry the greater offense." (*Chiu*, at p. 168.) Reduction to second degree murder was appropriate because, before Senate Bill 1437, the natural and probable consequences theory supported a conviction for second degree murder. Moreover, allowing the People to elect to retry the defendant for first degree murder was also appropriate because the jury was instructed on a direct aiding and abetting theory, which supported first degree murder

liability. (*Chiu,* at p. 168.) Nowhere in the *Chiu* decision does the court test the sufficiency of the evidence supporting the direct aiding and abetting theory.

We do note that the *Figueroa* decision, upon which Monroy relies, does suggest that when there has been a change in the law and evidence at the original trial would have been relevant to prove a newly-required element—or in this case, a valid legal theory—the appellate court should review for sufficiency of the evidence, instead of treating the matter as instructional error. This suggestion in *Figueroa* is not supported by the authorities it relies upon. The *Figueroa* court addressed a change in the law related to an enhancement for trafficking drugs within 1,000 feet of a school. During the pendency of the appeal, the statute was amended to require that school be in session or that the school was being used by minors at the time of the crime. (*Figueroa*, *supra*, 20 Cal.App.4th at p. 69.) The court reasoned that, "where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence." (*Id.* at p. 72.) In support of the suggestion that review for sufficiency of the evidence is appropriate where such evidence would have been relevant to prove the new element, the court cited *People v. Balderas* (1985) 41 Cal.3d 144 at pages 197-199 (*Balderas*). (See *Figueroa*, at p. 72.) But nothing in *Balderas* supports the notion that sufficiency of the evidence review is appropriate if evidence was relevant at the original trial and would have proved what the new law requires.

In *Balderas*, the court reversed a felony-murder special circumstance based on *Carlos* error, i.e., the judicially-established requirement that the actual killer had to have acted with the intent to kill.[5] (*Balderas*, *supra*, 41 Cal.3d at pp. 197-199.) *Carlos* was decided during the pendency of Balderas's appeal. Applying *Carlos*, the *Balderas* court

---

[5]     *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 152-154.

held:  "Retrial of the robbery-murder special circumstance allegation must be before a jury properly instructed on the necessity of intent to kill."  (*Balderas,* at p. 199, fn. omitted.)  The court went on to say:  "Now that both parties are aware of the importance of the intent issue, both must have the opportunity to introduce all evidence at their command on that issue."  (*Id*. at p. 199, fn. 25.)  This was the case even though evidence of intent to kill was relevant at the original trial to prove valid theories of deliberate and premeditated murder as an alternative first degree murder theory, or express malice to prove second degree murder.  Had a new trial on the special circumstance been denied by the *Balderas* court because the prosecution could have proved intent to kill at the original trial, the *Figueroa* court would have been correct to rely on *Balderas*.  But that was not the case.  Instead, the *Balderas* court remanded for a new trial on the special circumstance, allowing the prosecution to prove intent to kill using "all evidence at their command on that issue."  (*Balderas*, at p. 199, fn. 25.)

We finally note that a different panel of this court has relied on *Figueroa* for the proposition that retrial to prove a newly-added element, there, requiring proof that the defendant's transportation of methamphetamine was for purposes of sale, was "not barred by the double jeopardy clause or ex post facto principles because the question of whether defendant transported the methamphetamine for sale was not relevant to the charges at the time of trial and accordingly, this question was never tried."  (*People v. Eagle*, *supra*, 246 Cal.App.4th at p. 280.)  In support of this formulation of the inquiry, we cited footnote 2 in *Figueroa*, which stated:  "Respondent correctly points out, without dispute, that remand is not barred by the double jeopardy clause.  The issue of whether school was in session or that minors were using the facility during the crime was not relevant at the time of trial and the issue was therefore never tried."  (*Figueroa*, *supra*, 20 Cal.App.4th at p. 72, fn. 2, citing *People v. Garcia* (1984) 36 Cal.3d 539, 558, fn. 13 (*Garcia*), disapproved on another point in *People v. Lee* (1987) 43 Cal.3d 666, 676.)  But *Garcia*

31

did not require a showing of irrelevancy any more than *Balderas* did. In fact, it essentially rejected the notion.

In *Garcia*, a felony-murder special circumstance finding was reversed based on *Carlos* error. The court held that since Garcia's jury was not instructed that the special circumstance required an intent to kill, remand for retrial on the special circumstance was appropriate. (*Garcia*, *supra*, 36 Cal.3d at p. 558.) The court explained: "Recognizing that in many cases tried before *Carlos* insufficiency of the evidence to show intent to kill might be the result of the prosecution's failure to realize that proof of intent was essential, *he argues that his case is different because he was charged with premeditated murder as well as felony murder*. Consequently, he argues, in his case the prosecution must be deemed to have introduced all the evidence it had to show intent and premeditation, and since that evidence would be insufficient to support a finding of intent to kill, retrial of that issue is unnecessary. [¶] We agree with the defendant that the evidence presented may be insufficient to support a finding of intent to kill, but think it *unrealistic to assume that the prosecution, with a perfect case for proof of felony murder, necessarily presented all available evidence relating to intent*. We therefore reverse the special circumstance finding without directions, permitting the prosecution to seek retrial of that issue." (*Id*. at p. 557-558, fn. omitted, italics added.)

Similarly, here, we conclude it is unrealistic to assume that the prosecution, with a perfect case for attempted murder on a natural and probable consequences theory, necessarily presented all available evidence to prove Monroy directly aided and abetted the attempted murders in this case. Furthermore, the *Garcia* footnote, cited in *Figueroa*, itself cited *People v. Shirley* (1982) 31 Cal.3d 18, 71, which provides guidance on the availability of retrial after a change in the law. Regarding postconviction changes in the law and double jeopardy principles related to sufficiency of the evidence claims, the *Shirley* court explained: "The [insufficient evidence] rule achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials

32

on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] *But the incentive serves no purpose when . . . the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt.*" (*Id.* at p. 71, italics added.)

For reasons already expressed, the prosecution proved Monroy was guilty of attempted murder under the law as it stood at the time of her trial, which included natural and probable consequences as a valid theory of attempted murder. That has since changed, requiring reversal of her attempted murder convictions for alternative-theory error. But the failure of the prosecution to produce sufficient evidence to support the direct aiding and abetting theory at the original trial does not bar the prosecution from retrying her on that still-valid theory using "all evidence at their command on that issue." (*Balderas*, *supra*, 41 Cal.3d at p. 199, fn. 25; see also *Garcia*, *supra*, 36 Cal.3d at pp. 557-558.)

## D.

### *First Degree Murder Conviction*

Finally, turning to Monroy's conviction for the first degree murder of Detective Davis, Monroy notes her jury was instructed on three theories of murder: (1) first degree felony murder; (2) second degree murder as a direct aider and abettor; and (3) second degree murder under the natural and probable consequences doctrine.[6] The jury convicted her of first degree felony murder.

As mentioned previously, Senate Bill 1437 amended the felony murder rule to require proof that the "participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs" is either: "the actual killer," or "with

---

[6]     For reasons explained in the preceding section of this opinion, the third of these theories is no longer valid after Senate Bill 1437.

33

the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or "was a major participant in the underlying felony and acted with reckless indifference to human life," unless "the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subds. (e), (f).)

Because these were not requirements of felony murder at the time of trial, Monroy's jury was obviously not instructed on them. Monroy therefore argues, "while . . . the first degree felony murder theory has survived [Senate Bill] 1437 and [Senate Bill] 775, it now includes additional elements that must be proved beyond a reasonable doubt. And with those elements omitted from the instructions, reversal is necessary." She is correct. A criminal defendant "is entitled to have the jury decide every essential element of the crime . . . charged against him [or her]." (*Figueroa*, *supra*, 20 Cal.App.4th at p. 71.) Indeed, the Attorney General concedes reversal is required, but argues the appropriate remedy is to remand for retrial of the murder charge. We agree with the Attorney General.

As Monroy again acknowledges, "where, for example, the error involves omission of a new element retroactively added to the offense, a retrial is allowed without testing for the new element's proof." She argues, however, that "under the unusual circumstances of this case, . . . the absence of legally sufficient evidence [supporting the new felony murder elements] should prove fatal to the prospect of a retrial." In support of this argument, Monroy notes that the new "major-participant and reckless-indifference elements" now incorporated into the felony murder rule were already elements of the felony-murder special circumstance set forth in section 190.2, subdivision (d). She argues the People had an opportunity to charge her with the special circumstance and prove those elements, but chose not to do so, and therefore, "it's fair to hold the state to

its burden of trying her only once with legally sufficient evidence." We are not persuaded.

It is of course true that the People could have charged Monroy with the special circumstance, in which case, proof of her major participation in the underlying felony and reckless indifference would have been required. But the fact that the People declined to charge the special circumstance does not necessarily mean, as Monroy suggests later in her supplemental briefing on this issue, that it is unrealistic to believe the prosecutor possessed sufficient evidence of major participation and reckless indifference. "Prosecutors have broad discretion to decide who to charge, and for what crime." (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1260.) We simply do not know why the prosecutor declined to charge Monroy with the special circumstance. To be sure, it might have been due to a lack of confidence the special circumstance could be proved. Or it might have simply been the case that the prosecutor believed conviction of first degree felony murder was appropriate for Monroy's level of culpability, and the special circumstance should be reserved for Bracamontes. Now, however, conviction of felony murder requires the same additional proof that would have been required to prove the special circumstance.

Regardless of the reason the prosecutor declined to charge Monroy with the special circumstance, proof of major participation and reckless indifference were not relevant to the question of whether Monroy committed felony murder until Senate Bill 1437. Thus, even under the *Figueroa* formulation, described in detail above, retrial is not barred. We must apply the change in the law retroactively in this case, but the People must also be given the opportunity to prove the new elements on remand.[7]

---

[7] Because we hold the People must be given the opportunity to prove the new elements on remand regardless of whether substantial evidence was introduced in the original trial to support them, we decline to engage in an analysis under *People v. Banks*

35

## II

### *Mental Health Diversion*

Monroy contends we must remand the matter to the trial court for a determination as to whether or not she qualifies for mental health diversion. She is mistaken.

Monroy was convicted of the crimes in this case in February 2018 and sentenced the following month. Three months later, the Legislature added sections 1001.35 and 1001.36 to the Penal Code. (See Stats. 2018, ch. 34, § 24.)

"Section 1001.36 authorizes a pretrial diversion program for defendants with qualifying mental disorders. The statute defines ' "pretrial diversion" ' as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . .' (§ 1001.36, subd. (c).) The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).) [¶] As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the

---

(2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522. Should Monroy be retried and convicted, we will be in a better position to determine whether or not that conviction is supported by substantial evidence.

defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community. (Former § 1001.36, subd. (b)(1)-(6).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626-627 (*Frahs*).)

However, about three months after enacting section 1001.36, the Legislature amended this provision to exclude certain defendants from eligibility for diversion, including defendants like Monroy who are charged with murder. (§ 1001.36, subd. (b)(2)(A), as amended by Stats. 2018, ch. 1005, § 1; *Frahs*, *supra*, 9 Cal.5th at p. 627.)

Monroy argues the version of these diversion statutes originally enacted by the Legislature applies retroactively to her case under the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), specifically, "that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Frahs*, *supra*, 9 Cal.5th at p. 627.) According to Monroy, it is the originally-enacted version of these statutes that applies to her case, and not the amended version that she acknowledges excludes her from consideration for mental health diversion, because (1) absent an express retroactivity provision or strong evidence the Legislature intended retroactive application, statutes are deemed prospective only, and (2) even if the Legislature intended the amendment to operate retroactively, such an outcome would violate the ex post facto clauses of the state and federal Constitutions.

There can be no doubt that the diversion statutes apply to Monroy's case. Our Supreme Court has so held. (*Frahs*, *supra*, 9 Cal.5th at pp. 630-631.) We disagree, however, with Monroy's assertion that it is the originally-enacted version, as opposed to the amended version, that applies.

Our colleagues at the Fourth Appellate District rejected this very argument in *People v. McShane* (2019) 36 Cal.App.5th 245, explaining: " '[W]hether a new law is being applied retrospectively is closely intertwined with the question whether it is an unconstitutional ex post facto law, because a finding that the law is being applied

retrospectively is a threshold requirement for finding it impermissibly ex post facto.' [Citation.] [¶] 'The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime. [Citation.]' [Citation.] Hence, ' "the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is *criminal conduct* committed before the disputed law took effect." [Citation.]' [Citation.] [¶] Here, when [Monroy] committed [these crimes], [she] was not eligible for pretrial diversion, because . . . section 1001.36 did not yet exist. Now, [she] is not eligible for pretrial diversion, because of the murder exclusion. Thus, the enactment of the murder exclusion did not change the consequences of [her crimes] *as of the time [she] committed [them]*. The fact . . . that [she] was briefly eligible for pretrial diversion under . . . section 1001.36, as originally enacted, is irrelevant to the retroactivity analysis." (*Id.* at p. 260; see also *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1053-1054 [also rejecting ex post facto argument].)

Nevertheless, Monroy argues the presumption of prospective application of penal statutes, codified in section 3 and not discussed in either *McShane* or *Cawkwell*, controls the outcome here. In making this argument, she relies primarily on *People v. Buycks* (2018) 5 Cal.5th 857 (*Buycks*). There, our Supreme Court held the meaning of the statutory phrase " 'misdemeanor for all purposes' " in section 1170.18, subdivision (k), enacted as part of Proposition 47, did not have the same broad retroactive effect as other provisions of that proposition because "the authors of Proposition 47 twice expressly made references to the retroactive effect of the measure in some of its provisions but did not explicitly do so for subdivision (k) of section 1170.18." (*Buycks,* at p. 880.) In so holding, the court noted section 3, providing that "[n]o part of [the Penal Code] is retroactive, unless expressly so declared," creates " 'a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic

sources that the [lawmakers] . . . must have intended a retroactive application."
[Citations.]  Accordingly, " 'a statute that is ambiguous with respect to retroactive
application is construed . . . to be unambiguously prospective.' " ' [Citation.]" (*Buycks*,
at p. 880.)  The court concluded that informed members of the electorate voting on
Proposition 47 presumably would have known about this general presumption and
concluded subdivision (k) was not intended to have full retroactive application because
two other subdivisions "clearly reflect an intent to have full retroactive application,
whereas subdivision (k) uses no similar language." (*Buycks,* at p. 881.)

 *Buycks* is inapposite.  This is not a situation in which the Legislature attached
express retroactivity provisions to specific subdivisions but not others.  There are no
retroactivity provisions in either section 1001.35 or section 1001.36.  However, under
*Estrada*, the provisions apply retroactively because of the presumption that "ameliorative
changes are intended to 'apply to every case to which it constitutionally could apply,'
which would include those 'acts committed before its passage[,] provided the judgment
convicting the defendant of the act is not final.' " (*Buycks*, *supra*, 5 Cal.5th at p. 881,
quoting *Estrada*, *supra*, 63 Cal.2d at p. 745.)  To be sure, the ameliorative benefit
contained in the diversion statutes was narrowed by the subsequent amendment, but
Monroy cites us to no authority, nor have we found any on our own, requiring us to give
her the benefit of an ameliorative statute, one she was not entitled to at the time she
committed her crimes, after the Legislature has made clear in an intervening amendment
that it does not want defendants like Monroy to receive those benefits.

 Monroy is not entitled to a remand for a determination as to whether she qualifies
for mental health diversion.

### III

### *Instruction Regarding Bracamontes's Outbursts*

 Monroy contends the trial court prejudicially erred and violated her federal
constitutional rights by instructing the jury to disregard several of Bracamontes's

39

outbursts during the trial. While framed in terms of instructional error, this is more appropriately characterized as an assertion of evidentiary error and is forfeited. Even viewed under the rubric of instructional error, the claim is not saved from forfeiture by section 1259 because Monroy's substantial rights were not violated by any assumed instructional error.

## A.

### *Additional Background*

During the joint trial, Bracamontes disrupted the proceedings on five occasions. The first such disruption occurred when Bracamontes's brother, H., was testifying. H. apparently became emotional during his testimony, prompting Bracamontes to yell out: "I make you pay, all you mother fuckers, for all this shit." When the trial court admonished him to be quiet, Bracamontes responded: "Fuck you." The trial court then removed the jury from the courtroom as Bracamontes continued into a profanity-laced tirade that included a threat to "kill one of you mother fuckers." What transpired outside the presence of the jury is not relevant for our purposes. It will suffice to note Bracamontes was removed.

When the jury returned to the courtroom, the trial court admonished them to "disregard the outbursts" and keep in mind "that the evidence is what you hear from the witness stand, exhibits that are introduced, anything else I tell you to consider evidence," but not Bracamontes's outbursts. The trial court also informed the jury that Bracamontes had been removed and would remain outside the courtroom "until he commits to following the rules of the court, and to not being disruptive."

The second and third outbursts occurred during the testimony of Deputy Brown, the officer who lost his partner in the Motel 6 parking lot. When Brown took the stand, Bracamontes stated: "Shame on you, Brown." The trial court again told him to be quiet. Instead, Bracamontes said: "You made your friend Danny die." The trial court again removed the jury from the courtroom as Bracamontes continued: "You straight coward,

40

run away like a little fucking bitch. All the officers died because of you, too. You should resign. Are you ashamed of yourself?" Defendant was again removed from the courtroom. Upon their return, the jury was admonished: "Again, you are instructed to utterly disregard his outbursts. None of that is evidence, you will not consider that in any way."

Deputy Brown then testified concerning the tragic events in the Motel 6 parking lot. During a break in his testimony, Bracamontes was returned to the courtroom. When Brown testified that Bracamontes ran over his partner in the parking lot, Bracamontes started laughing. The trial court removed both the jury and Bracamontes from the courtroom, prompting Bracamontes to ask: "What did I say now?" He then stated: "Fuck you all. Fuck Danny Oliver, Mike Davis. Fuck all the fucking cops." When the jury returned to the courtroom, they were again admonished to disregard Bracamontes's conduct because it was "not evidence in this case."

The fourth outburst occurred at the conclusion of A.'s testimony. After he was excused from the witness stand, Bracamontes stated: "Just sorry I didn't fucking kill you." A. responded: "Fuck you." Bracamontes replied: "Black life don't matter." Additional words were exchanged, including a particularly vile racial epithet hurled in A.'s direction. As Bracamontes laughed, the trial court admonished the jury to "disregard the outburst and the exchange. It's not evidence in this case." The jury was then excused for the weekend and left the courtroom as Bracamontes continued with vulgar and racist remarks.

The final outburst occurred during Deputy Davis's testimony. Bracamontes interrupted the testimony to inform the trial court: "I don't want to fucking be in this fucking trial no more." The trial court again removed the jury as Bracamontes continued with more profanity directed at the trial, the judge, the prosecutor, the jury, "and the dead cops and their stupid families, too." Bracamontes was removed and informed he would

not be returning to the courtroom. When the jury returned, they were again instructed "not to consider in any respect the outburst that you just heard from Mr. Bracamontes."

At no point did Monroy's trial counsel object to the trial court's repeated admonishments to the jury to disregard Bracamontes's outbursts. Nor did counsel object to the underlying basis for those admonishments, that these outbursts were not evidence in this case.

## B.

### *Forfeiture*

Although couched in terms of instructional error, the basis of Monroy's assertion that the trial court erred in instructing the jury to disregard Bracamontes's outbursts is the underlying argument that these outbursts were relevant to the jury's consideration of her duress defense and credibility in testifying that she believed her life was in danger when she assisted Bracamontes in his criminal enterprise.

Evidence Code section 354 provides, as relevant here, that a reviewing court shall not reverse a judgment based on the erroneous exclusion of evidence unless a miscarriage of justice has resulted and "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . ." (Evid. Code, § 354, subd. (a).) Stated simply, a defendant generally must raise the grounds for admissibility in the trial court, and do so with specificity; otherwise he or she is precluded from complaining on appeal. (*People v. Fauber* (1992) 2 Cal.4th 792, 854.)

Here, Monroy's trial counsel never objected to the trial court's ruling that Bracamontes's outbursts were not to be considered by the jury, let alone inform the trial court of the specific grounds for admissibility raised on appeal. Consequently, the trial court had no opportunity to consider Monroy's somewhat novel argument that although Bracamontes's outbursts "weren't literally in 'evidence,' " the jury should nevertheless have been permitted to consider them in determining whether or not to believe Monroy's

42

testimony regarding duress because the jury experienced the outbursts and jurors may properly use their "experience" in evaluating witness testimony. (CALCRIM No. 226.)

Even viewed under the rubric of instructional error, the claim is still forfeited. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We decline to decide whether or not the asserted error occurred because, even assuming the outbursts may be considered part of the "experience" a juror properly brings to evaluating witness testimony within the meaning of CALCRIM No. 226, we conclude instructing the jury not to consider the outbursts in this case did not result in a miscarriage of justice.

Bracamontes's outbursts, while vile and threatening, were not directed towards Monroy, but rather towards certain prosecution witnesses, the trial court, the prosecutor, and the jury. Thus, they do not corroborate Monroy's testimony that Bracamontes threatened her life during their drive from Utah to California. We do not dispute that the outbursts betrayed Bracamontes's impulsive and violent nature. However, there can be no doubt the jury drew this conclusion from properly-admitted evidence. Bracamontes shot and killed two peace officers. He shot and wounded a third officer and a fourth man, A., who refused to relinquish his car. In comparison to the evidence admitted at trial, Bracamontes's outbursts were mild. They showed he was nasty and unrepentant, but they did not provide significant evidence supporting Monroy's assertion that she assisted Bracamontes because she feared for her life or the lives of others. Moreover, Monroy's duress defense was undermined by strong evidence that she accompanied Bracamontes to California, and helped him commit a series of carjackings following the first shootout, not because she was afraid for her life or the lives of others, but because she loved him. We have already described some of this evidence and decline to repeat it here. It will

43

suffice to state that in light of all of the evidence received by the jury in this case, our confidence in the outcome is not undermined.

There has been no miscarriage of justice. Monroy's assertion of instructional error is therefore forfeited.

**IV**

***Duress Instruction***

Monroy also claims the trial court prejudicially erred and further violated her constitutional rights by providing the jury with an unmodified version of the standard duress instruction, CALCRIM No. 3402. This claim is also forfeited and, in any event, fails on the merits. Thus, her trial counsel did not provide constitutionally deficient assistance by failing to request modification of the instruction.

As given to the jury in this case, CALCRIM No. 3402 provides: "The defendant is not guilty of felony murder, murder based on natural and probable consequences, attempted murder, carjacking, attempted carjacking, or possession of an assault rifle if she acted under duress. [¶] Duress does not apply to directly aiding and abetting a murder. The defendant acted under duress if because of threat or menace she believed that her or someone else's life would be in immediate danger if she refused a demand or request to commit the crime. [¶] The demand or request may have been express or implied. The defendant's belief that her or someone else's life was in immediate danger must have been reasonable. [¶] When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant. [¶] And consider what a reasonable person in the same position as the defendant would have believed. A threat of future harm is not sufficient. The danger to life must have been immediate. [¶] The People must pro[ve] beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of felony murder, murder based on natural and

44

probable consequences, attempted murder, carjacking, attempted carjacking, or possession of an assault rifle."

On appeal, Monroy argues this instruction improperly limits the defense of duress to situations in which the defendant reasonably believes a person's life is in immediate danger, whereas under California case law, both "fear of death and fear of serious injury" can support the defense. However, Monroy's trial counsel did not object to the duress instruction given to the jury or request modification of the instruction to include fear of serious injury. Again, the "[f]ailure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights." (*People v. Anderson*, *supra*, 152 Cal.App.4th at p. 927.) Anticipating forfeiture, Monroy argues her trial counsel provided constitutionally deficient assistance by failing to object to the challenged instruction. We are not persuaded.

"A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there

simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"Penal Code section 26 declares duress to be a perfect defense against criminal charges when the person charged 'committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 289-290.) Acknowledging that CALCRIM No. 3402 tracks the language of the statute, Monroy points to a bench note indicating "[f]ear of great bodily harm can also raise the defense of duress," citing *People v. Otis* (1959) 174 Cal.App.2d 119 and *United States v. Bailey* (1980) 444 U.S. 394. (Judicial Council of Cal., Crim. Jury Instns. (2017 ed.) Bench Notes to CALCRIM No. 3402, p. 909.) As Monroy also observes, our Supreme Court cited *Otis* with apparent approval in *People v. Perez* (1973) 9 Cal.3d 651, stating: "Although a number of cases in this state have held that the fear must literally be of *death*, [*Otis*] suggests that the fine distinction between fear of danger to life and fear of great bodily harm is unrealistic. According to *Otis* (quoted approvingly in *People v. Lo Cicero* [(1969) ]71 Cal.2d 1186, 1191), however, the threat must be of present, immediate harm, not future violence." (*Id.* at pp. 657-658.)

Most recently, in *People v. Casares* (2016) 62 Cal.4th 808, disapproved on another point in *People v. Dalton* (2019) 7 Cal.5th 166 at page 214, our Supreme Court declined to "resolve any conflict in the decisions" regarding whether or not a "fear of great bodily harm falling short of a fear of death" could satisfy the defense because there was no evidence the threat at issue in that case was of immediate harm. (*Casares,* at p. 844, fn. 7.) Thus, the matter has not been conclusively resolved. However, we find convincing the court's suggestion that the comment made in *People v. Perez, supra*, 9 Cal.3d 651 may simply have been "a recognition that a threat to inflict great bodily harm implies, at least in some circumstances, a readiness to use force sufficient to threaten one's very life as well." (*Casares,* at p. 844, fn. 7.)

46

Here, as Monroy chronicles in detail, she repeatedly testified that she was afraid Bracamontes would shoot her or other people if she did not assist him in committing the carjackings. Sometimes she more generally said she was afraid Bracamontes would "hurt" her or other people. However, she also testified quite clearly that she was afraid for her life. Specifically, when asked about moving the AR-15 to C.'s Mustang, Monroy testified that Bracamontes told her to do so and added: "He would have probably tried to kill me right there if I would have said no." With respect to helping Bracamontes take J.'s truck, Monroy also testified that she was in fear for her life. She further stated that she feared for J.'s life. Viewed cumulatively, Monroy's stated fear was that Bracamontes would shoot *and kill* her or others if she did not assist him. Nowhere did she say she was afraid of great bodily harm not rising to the level of also threatening life. Thus, even if CALCRIM No. 3402 should be modified in an appropriate case to include fear of great bodily harm falling short of fear of death, this is not such a case.

Monroy's trial counsel did not act unreasonably by declining to object to CALCRIM No. 3402 or request modification of the instruction to include fear of great bodily harm. Nor is there any reasonable probability of a more favorable result had the jury been so instructed. Monroy's duress defense turned on whether or not the jury believed her testimony with respect to why she helped her husband. No reasonable juror, if he or she believed Monroy's testimony, would have concluded she was afraid of being shot but not also afraid of dying as a result. If believed, Monroy was afraid of both, and assisted Bracamontes because of that fear. However, the jury did not accept her duress defense, indicating it did not believe her testimony in this regard.

There is no reasonable probability the result would have been different had the jury been instructed fear of great bodily harm alone sufficed to support the defense of duress.

# V

## *Cumulative Prejudice*

Having concluded both of Monroy's instructional error claims are forfeited and, in any event, each was either without merit or harmless, we must also reject her assertion of cumulative prejudice flowing from those claims of error.

## DISPOSITION

Monroy's murder and attempted murder convictions (counts two, four, nine, ten, & thirteen) are reversed. In all other respects, the judgment is affirmed. The People shall have 60 days after the remittitur issues to inform the trial court whether or not they will retry Monroy for murder and/or attempted murder. In the event the People do not elect to retry her, the trial court shall confirm Monroy's remaining convictions (counts five, six, seven, eight, & fifteen) and resentence her accordingly.

                 /s/                          
                 HOCH, J.

We concur:

 /s/                       
BLEASE, Acting P. J.

 /s/                       
MURRAY, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.